## BECKER v. UNITED STATES.

(Circuit Court of Appeals, Seventh Circuit. October 5, 1920.)

No. 2711.

War ⬤⇒4—Evidence not sustaining conviction under Espionage Act.

Evidence *held* insufficient to support conviction, under Espionage Act June 15, 1917, § 3 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 10212c), for seditious utterances.

In Error to the District Court of the United States for the Western District of Wisconsin.

John M. Becker was convicted of violation of the Espionage Act, and brings error. Reversed.

Ralph W. Jackman, of Madison, Wis., for plaintiff in error.

B. R. Goggins, of Grand Rapids, Mich., for the United States.

Seymour Stedman, amicus curiæ.

Before BAKER, ALSCHULER, and PAGE, Circuit Judges.

PAGE, Circuit Judge. Defendant Becker was, on August 7, 1918, found guilty in the United States District Court for the Western District of Wisconsin on the first, third, and fifth counts of an indictment returned May 27, 1918, under section 3 of the Espionage Act of June 15, 1917 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 10212c), for the use in his speech in a public meeting at Monroe, Green county, Wis., on February 5, 1918, of the following language, set out and identical in each count of the indictment, viz.:

"The idea of having an administrator of fuel and food is ridiculous."

"There is no shortage of food. The idea of a shortage of food is being preached by agents employed by corporations for their own gain, and going about the country on high-paid salaries."

"This is a rich man's war. We won't have peace as long as these high-salaried fellows have jobs to protect."

"There is no labor shortage."

"There is no seed shortage."

There is also added and set out in the third and fifth counts the following:

"Farmers, beware of taxes, war taxes, which must be paid in July."

The charges are that the defendant:

First count: "Did willfully and feloniously make and convey certain false reports and false statements, with intent to interfere with the operation and success of the military and naval forces of the United States, and promote the success of its enemies."

Third count: "Did willfully and feloniously cause and attempt to cause insubordination, disloyalty, mutiny, and refusal of duty in the military and naval forces of the United States."

Fifth count: "Did willfully and feloniously obstruct the recruiting and enlistment service of the United States, to the injury of the service and of the United States."

⬤⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

This writ was prosecuted to reverse the judgment entered on the verdict, and as set out in the journal entries in the record reads as follows:

"That the defendant be sentenced to one year on each count, or three years in all."

But the bill of exceptions is as follows:

"The court sentenced the defendant to be imprisoned * * * for a period of three years, said sentences of imprisonment to run concurrently on each of the counts upon which conviction was had."

The circumstances surrounding the calling of the meeting at which the speech was made are important because they show conditions in Monroe. Green county had failed to "go over the top" on either of the Liberty Loans. Witness Lucksinger and others not named, who constituted the Green county council of defense, had so failed in their duties that Swenson, federal food administrator for Wisconsin, had made repeated complaints, and insisted that the council of defense should be reorganized, and in June, 1917, eight months before the meeting in question, had notified them to have the county chairman call a mass meeting and send in recommendations for a new council of defense, to be appointed by the state council. Nothing having been done, Swenson later summoned witnesses Ludlow and Lucksinger, and possibly others, to Madison, and told them that they must be re-organized. The witness Truckenbrod says that the meeting of February 5th was called pursuant to a meeting between the witnesses Lucksinger, Ludlow, Bolander, Neverman, and himself, where it was said:

"Here we are finding out that this council of defense expense is going to be more than any one has figured on, and we feel that the county board ought to know what is before them, how much it is going to cost. As long as we have to reorganize, we think it would be a good idea to call a session of the county board, and have them here when the organization is started, so they will all understand it, * * * so each one can go home and tell his people just what is expected of them in regard to the council of defense."

Because of a storm, only 6 of the 27 members of the county board were present; but there were others present, and the 50 or 60 people present proceeded as a kind of mass meeting. Many speeches were made, and, in a controversy over the statement that Dane, an adjoining county, had done better than Green county, defendant insisted that Green had been more liberal than Dane and that her people were loyal and patriotic. There is no evidence whatever that anything said or done by the defendant obstructed the recruiting or enlistment service of the United States, so that the fifth count is wholly unsupported.

There is substantial evidence in the record that the words set out in the indictment were used by the defendant in the course of and as a part of his speech. An examination of the record will show that all of the things which the witnesses remembered of what Becker said would probably require less than one minute to relate. Yet the record

also shows that he spoke in all from 15 to 20 minutes. No witness attempted to reconstruct or reproduce his speech. Two witnesses did, however, make statements that more clearly show what the speech was, and was intended to be as a whole, than it is possible to gain from any of the testimony bearing upon the isolated words of the indictment. The witness Dodge, who had the basis of an unfriendly feeling for the defendant, rather than a friendly one, came in after the defendant had made a part of his speech, but heard much of it, says:

"I think when I came in he [Becker] was trying to deliver a patriotic speech, but switched off onto the food and fuel situation."

The witness Saucerman, who had no occasion to feel friendly towards the defendant, says:

"After further discussing, in his opinion, the inadvisability of having called the county board together, the major portion of his talk was delivered to the assemblage as a group of farmers: 'You farmers, I want you farmers to remember' thus and so, his general idea of an economic address that he was delivering: 'You farmers must save your money; there will be taxes to pay in July, there will be war taxes.'"

It was clearly the impression of one of these men that the defendant was delivering a patriotic address, and of the other that he was delivering an economic address. And again, the witness Young undertakes to state the connection in which defendant used the language in the indictment, "Farmers, beware of taxes, etc.":

"Toward the close of the speech, after he had criticized the fact of calling the supervisors together and calling attention to the circumstances of this meeting—he told us to remember that they would have to pay for this, and they would have to pay for other things, and 'you have war taxes, you have to pay war taxes, and they will come in,' either June or July, I don't remember which he said."

Used in this connection, any construction must be very tortuous that will bring this part of the language of the indictment within any definition of a seditious utterance. Young, who was a traveling salesman for a wholesale grocery house, when he heard the statement about the preaching by high-salaried men, did not seem to think that the defendant was doing anything more than making a drive at him. Young remarked at the time: "He must mean me."

Another matter, indicating that many of the witnesses were not in a position to directly and accurately testify to or correctly interpret what Becker said, is the fact that their attention was being given to other matters. Kohli, when Becker said somebody was sneering at him, saw Neverman whispering to Young. He could not remember what words preceded, or what was said in the full discussion as to the food and fuel administration. Neverman said:

"During the time defendant was talking, Young and myself were talking on two occasions, one when I asked who the gentleman was who was coming to the railing, referring to Becker, and the other when Young leaned to me and said, 'That is for me,' when he made the reference about agents going about the country on high salaries. That was all there was to it."

Johonott says:

"Neverman, Young, and myself were talking, and Young and Neverman were smiling. I heard him say some one was sneering at him. This happened about four or five minutes after he started to talk."

Before one can be convicted for the use of words or phrases which are a part of a speech, the evidence should be so clear and convincing as to show that the language complained of is, in the connection in which it is used, subject to the interpretation sought to be placed upon it in the indictment. Becker was a native-born American citizen, and seems to have had the approval of the community in which he lived, because for 21 years he had been elected and re-elected to the important and responsible office of county judge.

One witness, in order to qualify himself to testify, made inquiries of the banks about the purchase of Liberty bonds by the defendant. He also gave a Sunday dinner to the other witnesses, Lucksinger, Neverman, Durst, Weirich, Young, the two Knoble girls, and others, among whom was the witness Karlen. We cannot conceive that the demands of justice require such a line of conduct on the part of witnesses, and where indulged in it warrants very close scrutiny of the testimony and the purposes of those who engaged in such activities.

In Schenck v. United States, 249 U. S. 47, 39 Sup. Ct. 247, 63 L. Ed. 470, the court said:

"The question in every case is whether the words used are used in such circumstances and are of such a nature as to create a clear and present danger that they will bring about the substantive evils that Congress has a right to prevent."

We must hold, as a matter of law, that the record does not show that the words used by the defendant meet the test laid down in the Schenck Case, so as to justify a conviction.

The judgment is reversed.